IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONALD D. DAVIS,                          Civil No. 08-6354-AA
                                            OPINION AND ORDER
          Plaintiff,

     vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.
_____

Michael A. Halliday
Mills Jacobson Halliday, PC
715 Commercial St. NE
Salem, OR 97301
     Attorney for plaintiff

Kent Robinson
Acting United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue
Portland, Oregon 97204-2902

David Morado
Regional Chief Counsel
L. Jamala Edwards
Special Assistant U.S. Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075
     Attorneys for defendant

1 - OPINION AND ORDER

AIKEN, Judge:

Claimant, Donald D. Davis, brings this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner denying his application for disability insurance benefits ("DIB") under Title II of the Act.  For the reasons set forth below, the Commissioner's decision is affirmed and this case is dismissed.

## PROCEDURAL BACKGROUND

On September 5, 2001, claimant filed an application for DIB, alleging disability as of June 12, 2001.  Tr.[1] 452.  The claim was denied initially and on reconsideration.  Id.  On April 14, 2003, an Administrative Law Judge (the "ALJ") held a hearing. Tr. 28-60.  On September 10, 2003, the ALJ found claimant not disabled under the Act.  Tr. 19-26.  On November 3, 2003, the Appeals Council denied claimant's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 4-5.

Claimant appealed the decision to the district court and on August 10, 2004, the court remanded the case to the agency based on the stipulation of the parties.  Tr. 346-47.  On May 26, 2005, following a second hearing, a second ALJ found claimant was not disabled under the Act.  Tr. 334-42.  On August 21, 2005, the

---

[1]"Tr." refers to indicated pages of the official transcript of the administrative record filed on April 8, 2009.

Appeals Council denied claimant's request for review, making ALJ 2's decision the final decision of the Commissioner.  Tr. 328-30.

Claimed appealed the decision to the district court and on August 24, 2006, the court again remanded the case to the agency. Tr. 473-517.  On April 18, 2007, following a third hearing, ALJ 2 found claimant again not disabled under the Act.  Tr. 554-570. On August 23, 2007, the Appeals Council vacated the April 18, 2007 decision and remanded the case with instructions to a third ALJ.  Tr. 573-74.  On April 17, 2008, following a fourth hearing, ALJ 3 found claimant not disabled under the Act.  Tr. 452-69.  On September 10, 2008, the Appeals Council denied claimant's request for review, making ALJ 3's decision the final decision of the Commissioner.  Tr. 439-442.  Claimant now seeks judicial review of the Commissioner's final decision.

### STATEMENT OF THE FACTS

Born in 1953, claimant received an honorable discharge from the United States Marine Corps in 1974.  Claimant has a high school education, three years of college, and some trade school training in aircraft maintenance.  Claimant has past relevant work experience as an aircraft mechanic, a retail sales clerk, a small parts assembler, and a janitor.

Claimant alleges disability as of June 12, 2001 from a combination of impairments including chronic myofascial scapular

pain,[2] anxiety, sleep disturbance, osteoarthritis of his left knee, and depression.  Claimant's shoulder impairment is the result of an injury sustained in 1973 while working on helicopters in the Marine Corps.  Following his honorable discharge in 1974, claimant worked in the aircraft industry on and off for approximately 30 years.  Claimant last worked on June 12, 2001, when he left his position at Boeing due to the progression of his symptoms.

On June 10, 2002, the United States Department of Veterans Affairs (the "VA") determined claimant's service-connected "major depressive disorder" resulted in a 30% VA disability rating. Apparently, the VA previously determined claimant's shoulder injury resulted in a 40% disability rating.  Thus, the claimant's combined impairments resulted in a 70% VA disability rating.  The VA also determined that although claimant had fibromyalgia, it was not service-connected.  The VA found claimant's 70% disability rating prevented him from remaining employed.  On October 23, 2003, the VA considered claimant's disability "permanent and total" as of June 13, 2001, the day after claimant left Boeing.  The VA also found claimant's shoulder condition had progressed to a 30% disability evaluation for each shoulder.

---

[2]Myofascial scapular pain is also referred to as "snapping scapula" syndrome in the record.  Myofascial scapular pain is pain "pertaining to or involving the fascia surrounding and associated with muscle tissue" in the shoulder blade.  Tr. 477 (internal citation omitted).

4 - OPINION AND ORDER

### STANDARD OF REVIEW

This court must affirm the Secretary's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). The court must weigh "both the evidence that supports and detracts from the Secretary's conclusions." Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). However, the ALJ is responsible for determining credibility and resolving conflicts and ambiguities in the record. Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). Thus, the ALJ's rational decision must be upheld even if the evidence is susceptible to more than one rational interpretation. Id.

### DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous

period of not less than 12 months. . . ."  42 U.S.C. §
423(d)(1)(A).

The Secretary has established a five-step sequential process
for determining whether a person is disabled.  Bowen v. Yuckert,
482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1502, 416.920.  First
the Secretary determines whether a claimant is engaged in
"substantial gainful activity."  If so, the claimant is not
disabled.  Yuckert, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b),
416.920(b).

In step two the Secretary determines whether the claimant
has a "medically severe impairment or combination of
impairments." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§
404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three the Secretary determines whether the
impairment meets or equals "one of a number of listed impairments
that the Secretary acknowledges are so severe as to preclude
substantial gainful activity."  Id.; see 20 C.F.R. §§
404.1520(d), 416.920(d).  If so, the claimant is conclusively
presumed disabled; if not, the Secretary proceeds to step four.
Yuckert, 482 U.S. at 141.

In step four the Secretary determines whether the claimant
can still perform "past relevant work."  20 C.F.R. §§
404.1520(e), 416.920(e).  If the claimant can work, she is not
disabled.  If she cannot perform past relevant work, the burden

shifts to the Secretary.  In step five, the Secretary must establish that the claimant can perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Secretary meets this burden and proves that the claimant is able to perform other work which exists in the national economy, she is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

### The ALJ's Findings

At step one, the ALJ found claimant had not engaged in substantial gainful activity since the alleged onset date.  Tr. 455.  At step two, the ALJ found claimant has the following severe impairments: chronic myofascial scapular pain; fibromyalgia; osteoarthritis of the left knee; adjustment disorder with mixed depression and anxiety; and pain disorder. Id.  At step three, the ALJ found claimant's combination of impairments did not meet or medically equal any of the listed impairments.  Tr. 456.

The ALJ then determined claimant's residual functional capacity ("RFC"[3]).  Specifically, the ALJ found claimant could: lift and carry 10 pounds occasionally and less than 10 pounds frequently; sit for up to six hours and stand or walk for up to two hours in an eight-hour workday, provided claimant is

---

[3]The RFC is the most a claimant can do in a work setting, despite any limitations.  20 C.F.R. § 404.1545(a)(1).

7 - OPINION AND ORDER

permitted to change his position at will between sitting and standing; and occasionally stoop, kneel, or crouch.  Tr. 458. The ALJ found claimant should not crawl, engage in overhead reaching, or use ladders, ropes, or scaffolds.  Id.  Lastly, the ALJ found that due to side effects from medications, claimant was restricted to no more than semi-skilled work and should avoid concentrated exposure to hazardous conditions.  Id.

At step four, the ALJ found claimant was capable of performing past relevant work as a small parts assembler.  Tr. 467.  In the alternative at step five, the ALJ found claimant possessed skills which would transfer to a variety of sedentary sales occupations.  Id.  Therefore, claimant was not disabled under the Act.  Id.

## DISCUSSION

Claimant alleges five errors: 1) the ALJ improperly rejected claimant's testimony; 2) the ALJ improperly rejected the opinion of claimant's treating and examining doctors; 3) the ALJ failed to give "great weight" to the VA disability rating; 4) the ALJ failed to consider claimant's need to lie down; and 5) the ALJ failed to consider claimant's psychologically-based pain.

1.  Claimant's Credibility

"Credibility determinations are the province of the ALJ." Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  A claimant alleging disability on the basis of subjective symptoms "must

produce objective medical evidence of an underlying impairment
'which could reasonably be expected to produce the pain or other
symptoms alleged....'"  Smolen v. Chater, 80 F.3d 1273, 1281 (9th
Cir. 1996)(quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th
Cir. 1991)(en banc)).  Absent evidence of malingering, the ALJ
may reject claimant's testimony regarding the severity of the
symptoms only by providing clear and convincing reasons.  Smolen,
80 F.3d at 1283-84.  In addition, the ALJ's findings must be
sufficiently specific to allow the reviewing court to determine
the ALJ did not arbitrarily reject claimant's testimony regarding
pain.  Bunnell, 947 F.2d at 345-46 (internal citation omitted).

In determining claimant's credibility, the ALJ may consider
many factors including: ordinary techniques for determining
credibility (such as the consistency of claimant's statements
regarding pain and claimant's reputation for trustworthiness);
claimant's failure to seek treatment or follow treatment plans;
and the relationship between claimant's daily activities and
claimant's testimony regarding pain.  Smolen, 80 F.3d at 1284.

Claimant testified that he is extremely limited in his daily
activities.  Claimant's pain began in 1972 and has steadily
progressed over the years.  Claimant sleeps three to four hours
per night, waking up every 10 to 20 minutes to change positions.
Occasionally claimant has to stay in bed all day due to pain.
When claimant is not bedridden, he generally spends his days in

his garage listening to talk radio.

Although the amount of time claimant can sit or stand varies on a daily basis, he generally can stand for 30 minutes. After 30 minutes, claimant generally needs to lie down for 15 - 30 minutes, although this time can vary greatly. Laying down somewhat relieves claimant's pain because his pain worsens with movement. Claimant can sit for 5-10 minutes at a time.

Like his other symptoms, claimant alleges the oseoarthritis in his knees has progressively worsened. Claimant's knees go out on him two or three times per week, causing plaintiff to fall down. On one occasion, claimant's knees were drained to remove accumulated fluids.

The ALJ found claimant "clearly" had medical conditions that could reasonably result in the alleged symptoms if claimant failed to follow his medical regimen or exceeded his RFC. Tr. 460. However, the ALJ found claimant's allegations as to the intensity, persistence, and limiting effects of his symptoms were disproportionate to, and not supported by, the objective medical findings and other corroborating evidence. Id.

The ALJ provided several specific reasons for finding claimant not credible. For example, the ALJ noted that claimant failed to comply with his proscribed medical regimen and missed numerous follow-up appointments. Tr. 461. The ALJ stated that "[b]esides demonstrating noncompliance, this suggests that

10 - OPINION AND ORDER

finding the cause of his problems was not especially important to the claimant and that his symptoms may not have been as serious as has been alleged in connection with this application and appeal." Id. As stated above, the ALJ may consider claimant's failure to seek treatment or follow treatment plans when determining claimant's credibility. Smolen, 80 F.3d at 1284.

The record reveals a history of missed appointments. On September 22, 1999, Dr. Campbell wrote, "he missed an appt with me, several with Ortho, didn't respond to [physical therapy's] calls for appt." Tr. 202. Dr. Campbell continued, "I have no good ideas for treatment; my best thoughts were an Ortho opinion and TNS, but he missed these appts...." Id.

On January 8, 2001, Dr. Campbell stated claimant kept only four of 14 appointments with him, cancelling or not showing for the others due to work or pain. Tr. 188. Although scheduled to see Orthopedics on seven occasions, claimant only kept one appointment. Id. Significantly, claimant was referred to a specialist in orthopedic shoulder surgery yet failed to keep that appointment.[4] Id.

On June 8, 2001, claimant was referred to Dr. Wyles, a

_____

[4]Although claimant stated he did keep this appointment, he is mistaken. Claimant kept his appointment with Alan Albright and Michelle Garland, orthopedic physician assistants. Tr. 197, 635. However, claimant was then referred to a specialist in orthopedic shoulder surgery. Tr. 197. Claimant did not keep that appointment. Tr. 188.

Physiatrist.  Tr. 249.  Included in Dr. Wyles' "plan" was a note that claimant "may follow up with physiatry in Salem since the drive from Salem to KSMC was difficult for him."  Id.  There is no record of claimant following up with a physiatrist in Salem.

Claimant also complained of gradually progressive bilateral knee pain.  Tr. 541.  On January 26, 2004, Dr. Campbell examined claimant.  Tr. 384-87.  Although the objective examination of claimant's knee was normal, Dr. Campbell ordered an MRI due to "the complexity of [claimant's] syndrome, and [claimant's] perception of the severity of [his knee impairment]..."  Tr. 386.  In addition to the MRI, Dr. Campbell directed claimant to return to the clinic in three to four months.  Id.  Claimant never obtained the MRI and did not return to the clinic for over two years.  Tr. 541, 635.

On May 4, 2006, Dr. Campbell noted that he had last seen claimant in January of 2004 "for disability exam; he did not keep f/u appt.  Back because he needs disability paperwork filled out."  Tr. 541.  Dr. Campbell drained fluid from claimant's knees and directed claimant to return to the clinic in 1-2 months if the knee pain persisted.  Tr. 542. Claimant did not return to the clinic for approximately 11 months.

The ALJ properly considered claimant's failure to seek and/or keep treatment plans in determining his credibility.  Smolen, 80 F.3d at 1284.  The ALJ "is entitled to draw inferences

logically flowing from the evidence.  <u>Sample v. Schweiker</u>, 694
F.2d 639, 642 (9th Cir. 1982).  It is reasonable to infer that a
person who has a history of missing appointments is not entirely
credible as to allegations of severe pain and extremely limited
daily activities.

The ALJ opined claimant's failure to follow up may have
resulted from claimant's knowledge that the objective findings
would weaken his case.  This comment took the form of an aside by
the ALJ.  The ALJ simply stated the "reality...should be
mentioned..."  Tr. 461.  Claimant is correct in stating that this
was an incorrect assumption by the ALJ.  However, this error is
harmless as the underlying reasons for the credibility
determination provide clear and convincing evidence that
claimant's knee, back, and shoulder pain is not as severe and
limiting as alleged by claimant.  <u>Carmickle v. Comm'r of Soc.
Sec. Admin.</u>, 533 F.3d 1155, 1162 (9th Cir. 2008).

In finding claimant not credible, the ALJ also noted
evidence in the record suggesting claimant was exaggerating his
symptoms and limitations.  Dr. Hook noted claimant's *demonstrated
performance* during a May 22, 2003 examination was inconsistent
with claimant's allegations.  Dr. Hook noted that claimant
reported that he was unable to work at all.  Tr. 314.  However,
based on claimant's actual, demonstrated functional capabilities,
Dr. Hook felt claimant should be able to: stand about six hours;

sit at least two hours; and lift and/or carry 10 pounds occasionally and frequently.  Tr. 315.  Dr. Hook also stated that based on the totality of the medical evidence, claimant should be able to perform light work.  Tr. 461.

Dr. Hook also noted that although claimant reported significant pain in his back, shoulders, and neck, those areas showed "little real sign of tenderness or pain elicited..."  Tr. 313.  Claimant also showed no signs of pain upon demonstrating his snapping and popping scapula.  Id.  Claimant moved "quite easily through normal activities and is able to get up and down off the examining table without difficulty."  Tr. 314.  As noted by the ALJ and Dr. Hook, claimant's *demonstrated abilities* during the examination conflicted with claimant's self-reporting of his symptoms and limitations.  Dr. Hook's opinion, based on his independent clinical findings, provides clear and convincing evidence for determining claimant is not credible.

In addition, the ALJ noted the report of a physical therapist that claimant "probably did not give his best effort" during an examination.  Tr. 282.  Claimant argues this note is not a clear and convincing reason for discrediting him.  If the ALJ relied solely on the physical therapist's comment in finding claimant not credible, claimant's argument may be valid.  However, the ALJ here is not relying solely on the note in determining claimant's credibility. The physical therapist's note

14 - OPINION AND ORDER

simply provides additional support for the ALJ's ultimate
credibility finding.  See Thomas v. Barnhart, 278 F3d. 947, 959
(9th Cir. 2002)("[claimant's] efforts to impede accurate testing
of her limitations supports the ALJ's determination as to her
lack of credibility.").

As noted by the ALJ, Dr. Hook's clinical observations of the
claimant were inconsistent with claimant's reported limitations
and suggested an attempt "to portray limitations that are not
actually present in order to increase the chance of obtaining
benefits." Tr. 460-61.  The ALJ noted Dr. Hook's comment that
claimant was "heavily tanned" and had "normal muscle tone and
bulk" throughout his neck and back.  Tr. 313.  Although a
"heavily tanned" person with normal muscle tone could indeed be
disabled, these observations are inconsistent with claimant's
testimony at the hearings.  Claimant testified to extremely
limited daily activities, with days spent listening to the radio
in his garage or lying down in bed.  At a hearing approximately
one month prior to Dr. Hook's examination, claimant, when asked
what he does in a typical day, responded:

>    A.  Nothing.  I basically just listen to my radio in
>    the garage.  I do a little light woodworking, but like
>    I said, you know, I can do that for a little bit, but
>    then I have to go and lay down.  Other than that
>    there's not much I do.
>
>    Q.  Do you drive?
>
>    A.  No.  No.

Q.  Do you have any hobbies?

A.  No.

Q.  How about lifting?  Do you have difficulty lifting?

A.  Anything over five pounds is close to my capacity
as to how much I can lift.

Q.  Do you ever lift a grocery bag?

A.  If it's got bread in it...

Tr. 35-36.  As noted by the ALJ, this testimony is inconsistent
with Dr. Hook's note that claimant demonstrated the ability to
lift and/or carry 10 pounds occasionally and frequently during
the examination.  Tr. 315, 461.  In addition, the fact that
claimant was "heavily tanned" is inconsistent with claimant's
testimony of spending the day in his garage or in bed.  As stated
above, the ALJ "is entitled to draw inferences logically flowing
from the evidence." Sample, 694 F.2d at 642.  The ALJ could
rationally infer that this "heavily tanned" claimant, who
testified to spending his days in his garage or laying down in
bed, was not being entirely honest regarding the full extent of
his daily activities.  A legitimate inference is that the
claimant is testifying to more severely limited daily activities
than exist in actuality.  Dr. Hook's opinion, in addition to
casting doubt on claimant's credibility as to the self-reporting
of his symptoms and limitations, also calls into doubt claimant's
testimony regarding his daily activities.

Claimant correctly points out that the ALJ made some errors in his credibility determination. For example, the ALJ noted that claimant rode to the hearing while laying down in the "back seat" of a Ford Explorer. Tr. 460. The ALJ then stated that a Ford Explorer is not a particularly large vehicle, and implied that the claimant, rather than being able to lay down flat, would instead have been cramped into a fetal position. Id. This note appears to be a misunderstanding on the part of the ALJ. As noted by claimant, the back seat of a Ford Explorer may be lowered, at which point it is possible for someone to lay flat in the "back", which would not be possible in the "back seat."

The ALJ also improperly relied on the questionnaire filled out by claimant's wife stating claimant went fishing once every three weeks. Tr. 141. The ALJ stated the questionnaire was evidence claimant engaged in daily activities inconsistent with his subjective limitations. Tr. 457. However, claimant's first hearing took place one-and-a-half years after his wife completed the questionnaire. There was no evidence that claimant went fishing at the time of the first hearing.

The ALJ also opined that claimant may lack the motivation to return to work because to do so means claimant would lose his VA disability. Tr. 461-62. The ALJ pointed out that by performing lighter work, claimant would lose a considerable portion of his income, and would not be able to match the earnings he received

while working in the aviation industry.  Id.  This is not a clear
and convincing reason for finding claimant not credible.
However, because the remaining reasons, as well as the ALJ's
"ultimate credibility determination," are adequately supported by
substantial evidence, the ALJ's errors here are harmless.
Carmickle, 533 F.3d at 1162.  The errors do not negate the
validity of the ALJ's determination that claimant is not credible
and thus do not require remand.  Batson v. Comm'r of Soc. Sec.
Admin., 359 F.3d 1190, 1197 (9th Cir. 2004).

     It is important to note that the ALJ did not find claimant
was not in pain and was not limited in his daily activities.
Rather, the ALJ found that although claimant was significantly
impaired, he was not so impaired as to preclude any gainful
activity.  The ALJ provided clear and convincing reasons for
finding claimant not credible.  Perhaps most importantly, the ALJ
noted claimant *demonstrated the ability to work* during the
examination by Dr. Hook.  The ALJ's findings are supported by
substantial evidence in the record as a whole and were specific
enough to show the ALJ did not arbitrarily discredit the
claimant.  Therefore, the ALJ's credibility determination will
not be disturbed.

2.  Medical Evidence

     Claimant argues the ALJ improperly rejected the opinions of
four doctors: Dr. Boespflug; Dr. Campbell; Dr. Schwab; and Dr.

Rullman.

The ALJ has a duty ro resolve conflicts and ambiguities in the medical record. Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). Generally, the opinions of treating physicians are given more weight than the opinions of examining physicians. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Similarly, the opinions of examining physicians receive more weight than the opinions of nonexamining physicians ("NEP"). Id. The ALJ may reject the contradicted opinion of a treating or examining physician by providing "specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. An ALJ may provide "specific and legitimate reasons" for crediting one opinion over a conflicting opinion by summarizing the facts and conflicting evidence in a thorough manner, stating his interpretation, and making findings. Magallanes, 881 F.2d at 751.

Physicians generally provide two types of opinions in DIB cases. Medical opinions include the physician's diagnosis and prognosis, as well as statements concerning the nature and severity of the claimant's impairments, symptoms, and limitations. 20 C.F.R. § 404.1527(a)(2); Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001). Alternatively, opinions that the claimant is "disabled", or "unable to work", are decisions specifically reserved to the Commissioner. 20 C.F.R. §

404.1527(e).

Dr. Boesplug

Dr. Boespflug was claimant's primary care physician.  The
ALJ afforded Dr. Boespflug's opinions little weight because they
are inconsistent and not supported by substantial evidence in the
record.  In addition, the ALJ determined Dr. Boespflug's notes
demonstrated claimant was capable of retraining into a lighter
job.  Claimant argues Dr. Boespflug's opinions are not
inconsistent, but rather reflect Dr. Boespflug's opinion that
claimant's condition deteriorated over time.

On June 18, 2001, Dr. Boespflug placed claimant on short-
term disability and stated claimant should consider a long-term
job change.  Tr. 242.  The ALJ noted that on August 27, 2001, Dr.
Boespflug stated that per Dr. Wyle (discussed below), claimant
was probably not employable *without considerable retraining*.  Tr.
241, 463.  The ALJ noted that on September 20, 2001, Dr.
Boespflug completed a physician's report for claimant's
application for short-term disability.  Tr. 290, 463.  Dr.
Boespflug checked a box stating claimant was totally disabled.
Tr. 290.  Total disability was defined on the form as a
"[d]isability which renders patient incapable of continuing
employment in any gainful occupation for which substantial
retraining would not be required." Id. (emphasis in Dr.
Boespflug's note).  The ALJ noted that Dr. Boespflug also checked

the box stating claimant's disability was "permanent" while
commenting claimant required "rehab/training to some field with
minimal upper body strength and effort." Tr. 291.  Although not
specifically cited by the ALJ, Dr. Boespflug also checked the box
indicating claimant was a "fair" candidate for rehabilitation.[5]
Tr. 291.

The ALJ also points to a December 10, 2002 disability form
in which Dr. Boespflug opined that due to claimant's
deteriorating upper body and back problems, claimant was not
expected to be able to ever return to work, and was not a viable
candidate for vocational rehabilitation.  Tr. 297.  Dr. Boespflug
also stated claimant had a severe limitation of functional
capacity, and was incapable of minimal (sedentary) activity.  Id.
Dr. Boespflug stated claimant was restricted to very limited
lifting and upper body use.  Id.  However, under "present
limitations", Dr. Boespflug stated claimant was "physical[ly]
unable to continue job in aircraft manufactur[ing]."  Id.

As stated above, opinions that the claimant is "disabled",
or "unable to work", are decisions specifically reserved to the
Commissioner.  20 C.F.R. § 404.1527(e).  The reason for this, as
stated by the ALJ, is that doctors are not vocational experts and
are not necessarily familiar with the Act.  The examples listed

---

[5]The other rehabilitation options were "good" and "poor."
Tr. 291.

above underscore this point.  In the context of disability
determinations under the Act, Dr. Boespflug's opinion that
claimant was totally and permanently disabled is inconsistent
with his opinion that claimant is a "fair" candidate for
vocational rehabilitation.  The ALJ found that the above notes
indicated that while Dr. Boespflug felt claimant was
(permanently) unable to continue working as an aircraft mechanic,
he was capable of retraining into a lighter job.  Tr. 463.  The
ALJ's interpretation of Dr. Boespflug's somewhat ambiguous notes
was rational.

    The ALJ also noted Dr. Boespflug's opinions were internally
inconsistent.  Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595,
603 (9th Cir. 1999).  For example, on August 27, 2001, Dr.
Boespflug stated claimant could not sit or stand for more than
five minutes.  Tr. 287.  On December 18, 2001, Dr. Boespflug
filled out a form stating claimant could sit four hours at a
time, up to six hours in an eight-hour workday.  Tr. 289.
Approximately three weeks later, in a January 9, 2002 letter to
the VA regarding claimant's disability, Dr. Boespflug referenced
Dr. Wyles' note regarding the need to retrain claimant for a
different occupation.  Tr. 275.  Dr. Boespflug then noted
claimant's employability would be limited because claimant could
lift no more than 25 or 30 pounds, and could not maintain a
seated position *for any length of time*.  Id.

22 - OPINION AND ORDER

On December 18, 2001, Dr. Boespflug completed a physical assessment form for claimant. Tr. 289. Dr. Boespflug stated claimant was "[n]ot able to do upper body work." Id. However, on the same form, Dr. Boespflug stated claimant could occasionally lift and/or carry 11-20 pounds and frequently lift and/or carry 6-10 pounds.

Finally, the ALJ found Dr. Boespflug's opinion was entitled to little weight because it was inconsistent with substantial evidence in the record. The findings of Drs. Hook and Wyles constitute substantial evidence. The opinion of an examining doctor is substantial evidence if it is based on independent clinical findings. Orn v. Astrue, 495 F.3d 632 (9th Cir. 2007). "Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence... or (2) findings based on objective medical tests that the treating physician has not herself considered..." Id.

As stated above, Dr. Hook examined claimant on May 22, 2003. Tr. 312. During this examination, Dr. Hook noted that although claimant reported significant pain, "[p]alpation over areas of pain show little real sign of tenderness or pain elicited." Tr. 313. Dr. Hook also noted that claimant's effect was "euthymic, and [claimant] laughs while describing his pain at a number of points during the interview." Id. Dr. Hook found only two of

23 - OPINION AND ORDER

the 18 fibromyalgia trigger points were classically positive, showing pain response and eliciting complaints of pain.  Id. Significantly, Dr. Hook noted that although claimant could demonstrate "popping and snapping" of his scapulas, claimant showed no expression of pain as he did it.  Id.

Perhaps most importantly, Dr. Hook ultimately found that based on claimant's *demonstrated functional abilities in the examination*, he should be able to: stand and move about for approximately six hours; sit at least two hours; and lift and/or carry 10 pounds occasionally and frequently.  Tr. 314-15.  Dr. Hook also stated that although claimant alleged numerous limitations, "I do not find a clear rheumatologic, neurologic, or orthopedic reason that the patient should be limited in sitting, lifting occasionally or frequently, or postural activities."  Tr. 315.  Considering claimant's age, sex, and level of conditioning, Dr. Hook projected claimant should be able to lift and/or carry 20 to 40 pounds occasionally and 10-20 pounds frequently, with no limitations on postural activities such as climbing and balancing.  Id.

Dr. Boespflug's opinion is also inconsistent with the opinion of Dr. Wyles, a Physiatrist who examined claimant on June 8, 2001.  Dr. Wyles stated claimant lacked the trigger points for fibromyalgia.  Tr. 251.  Dr. Wyles stated that claimant's job required lifting 25-30 pounds which resulted in a flaring up of

claimant's symptoms.  Although claimant had some limitations in
his shoulder range of motion, Dr. Wyles stated "[t]his patient is
employable in an alternative job."  Id.  Dr. Wyles also suggested
claimant consider vocational retraining.  Id.

Although the independent clinical findings of Drs. Hook and
Wyles constitute substantial evidence on their own, Dr.
Boesplug's opinions are also inconsistent with the findings of
the NEP.  The NEP found claimant could: occasionally lift and/or
carry 10 pounds; frequently lift and/or carry less than 10
pounds; stand and/or walk at least two hours in an eight-hour
workday; and sit about six hours in an eight-hour workday (with
one-minute stretch breaks every hour).  Tr. 231-36.  Although the
NEP opinions, on their own, are not substantial evidence, they do
support the opinions of Drs. Hook and Wyles.

As stated above, the ALJ is responsible for resolving
conflicts and ambiguities in the medical record.  Magallanes, 881
F.2d at 750.  The ALJ's rational decision must be upheld even if
the evidence is susceptible to more than one rational
interpretation.  Id.  The ALJ provided specific and legitimate
reasons for giving little weight to Dr. Boespflug's opinions.
These reasons are supported by substantial evidence in the
record.  Thus, the ALJ's findings will not be disturbed.

Dr. Campbell

Dr. Campbell was the Chief of Rheumatology at the VA, and

treated claimant on multiple occasions over several years.  The
ALJ gave specific and legitimate reasons for giving little weight
to Dr. Campbell's opinions: Dr. Campbell relied heavily on
claimant's subjective complaints; Dr. Campbell's opinion was
inconsistent with other substantial evidence; and Dr. Campbell's
opinion did not provide a basis for the ALJ to determine
claimant's RFC.  In addition, the ALJ found Dr. Campbell's notes
suggested claimant was not disabled under the Act.

Upon reviewing the record, it is clear that Dr. Campbell
relied heavily upon claimant's self-reporting of his symptoms.
For example, on May 4, 2006, Dr. Campbell noted claimant's back
and shoulder pain had progressively deteriorated.  Tr. 541.  Dr.
Campbell also noted claimant could: stand for 15 minutes; sit for
limited periods; walk 100 feet; and lift and/or carry 10 pounds
or less.  Id.  However, these limitations were listed in the
portion of the examination notes detailing claimant's subjective
reporting of his symptoms and limitations.  Id.  As detailed
above, the ALJ provided clear and convincing reasons for finding
claimant not credible.

In addition, as noted by the ALJ, with the exception of
claimant's shoulder condition, Dr. Campbell's physical
examinations produced little objective signs of significant
impairments or a progression of claimant's condition.  On January
8, 2001, X-rays of claimant's spine showed only mild degenerative

changes.  Tr. 188.  An MRI showed mild degenerative changes of claimant's spine, with no specific evidence of nerve or spinal cord compression.  Id.  An EMG of claimant's left arm was normal, although due to claimant's inability to relax his muscles, no EMG of the paraspinous muscles was possible.  Id.  A nerve conduction study of claimant's left arm was normal.  Id.  Dr. Campbell's May 4, 2006 note did mention the fluid in claimant's knee.  Tr. 541. However, that note also reveals claimant's knee was "noninflammatory, no crystals."  Id.  In addition, X-rays showed only minimal degenerative changes in claimant's knees.  Tr. 544.

Regarding claimant's snapping scapula syndrome, the note reveals "extensive neg w/u; neg EMG (left arm) and C/T MRI 1/98." Tr. 541.  In addition, Dr. Campbell's January 8, 2001 note revealed all the referenced tests were normal or showed mild degenerative changes.  Tr. 188.  This note also goes into some detail regarding claimant's missed appointments and failure to conduct follow-up treatments, most notably with the orthopedic shoulder specialist.  Id.  Somewhat remarkably, after detailing these shortcomings in claimant's treatment, Dr. Campbell stated, "[w]e have exhausted diagnostic and therapeutic attempts, and I have no further suggestions for his care."  Id.

As noted by the ALJ, Dr. Campbell's opinion was not helpful in determining claimant's RFC.  The only specific limitations provided by Dr. Campbell were listed in the May 4, 2006 note

27 - OPINION AND ORDER

described above.  The ALJ properly discounted those limitations
because they were based on claimant's subjective reporting.  The
other notes from Dr. Campbell reflect his opinion that claimant
is "disabled."  However, opinions that a claimant is "disabled"
or "unable to work" are reserved for the Commissioner.  20 C.F.R.
§ 404.1527(e).  In addition, much like Dr. Boespflug's notes, the
ALJ found Dr. Campbell's notes suggest claimant is not disabled
under the Act.  For example, on April 10, 2000, Dr. Campbell
noted claimant was "clearly limited in his ability to work
because of all this, but whether [claimant] will meet criteria
for Soc Security disability is ??"  Tr. 195.  On January 1, 2001,
Dr. Campbell stated claimant:

> is clearly incapacitated by this pain syndrome.  He has
> chronic pain, which essentially prevents him from doing
> any kind of meaningful work.  Although I do not know
> why this is happening to him, I think that his
> disability is probably quite real, and he probably
> cannot be expected to continue to work in the future.

Tr. 189-90.  As noted by the ALJ, claimant continued to work
until June 12, 2001.  The fact that claimant continued to work
further lessens the credibility of Dr. Campbell's opinions
regarding claimant's disability under the Act.

On January 28, 2004, Dr. Campbell noted claimant's diffuse
pain had gradually progressed over the past four years.  Tr. 384.
Dr. Campbell noted claimant's symptoms had become so
"sufficiently severe that [claimant] has been unable to work for
at least two to three years."  Id.  Dr. Campbell noted claimant

28 - OPINION AND ORDER

had "essentially evolved into fibromyalgia," and claimant's chronic pain "will interfere with any *significant physical activity* other than simple [activities of daily living]; I think it is very unlikely that he can do any kind of *physical labor*." Tr. 396.

On April 20, 2004, Dr. Campbell completed an employment disability form for claimant.  Tr. 389-90.  Dr. Campbell stated claimant was permanently and totally disabled.[6]  However, upon filling out an identical form on September 18, 2001, Dr. Campbell left the boxes relating to disability blank.  Tr. 205-06. Instead of checking a box, Dr. Campbell referenced a letter (which is not in the record) and stated "I do not determine disability."  Tr. 205.

On Jan 14, 2005, Dr. Campbell filled out a disability form for claimant.  Tr. 392-93.  Dr. Campbell checked the box stating claimant was 75-100% disabled, with severe limitations, incapable of minimal, sedentary activity.  Tr. 393.  However, under "present limitations," Dr. Campbell opined claimant was "unable to work in aircraft maintenance/manufacture."  Id.  The ALJ's determinations that Dr. Campbell's opinions are not helpful in determining claimant's RFC and suggest claimant was capable of

---

[6]This disability form was the same form completed by Drs. Boespflug and Schwab.  The form defined "total" disability as a disability rendering claimant "incapable of continuing employment in any gainful occupation for which substantial retraining would not be required."  Tr. 617.

lighter work are rational and supported by substantial evidence in the record.

In addition, for the same reasons stated above in regard to Dr. Boespflug's opinion, Dr. Campbell's opinion that claimant is unable to perform any work is inconsistent with substantial evidence in the record. Dr. Campbell's findings that claimant is totally disabled is contradicted by the independent clinical findings of Drs. Hook and Wyles. Dr. Campbell's opinions are also inconsistent with the NEP opinions. The ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for finding Dr. Campbell's opinions are entitled to little weight.

Dr. Schwab

Dr. Schwab was claimant's treating physician following Dr. Campbell's retirement. The ALJ gave Dr. Schwab's opinion little weight. The ALJ commented that claimant sought Dr. Schwab's examination not in an attempt to seek treatment, but in an effort to receive disability benefits from his employer. Tr. 466-67. "The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." Lester, 81 F.3d at 832. However, the ALJ proceeded to provide specific and legitimate reasons for giving Dr. Schwab's opinion little weight.

On April 16, 2007, Dr. Schwab noted claimant was totally

disabled on a disability application.[7]  Tr. 617-18.  The ALJ gave
little weight to this opinion because it was rendered as part of
a "check-the-box, fill-in-the-blank form that... contains no real
description of medical findings to substantiate his opinion or
even explain how the claimant's impairments limit [claimant's
RFC]."  Tr. 466.  The ALJ's finding is permissible.  See <u>Crane v.
Shalala</u>, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ may reject check-
off reports that did not contain explanations for their
conclusions).

The ALJ also afforded little weight to Dr. Schwab's opinions
as to claimant's specific limitations because Dr. Schwab's
limitations were "an almost verbatim recitation of the limits Dr.
Campbell found on May 4, 2006, which in turn were based
substantially on the subjective complaints of the claimant."  Tr.
467.  Dr. Schwab's May 7, 2007 "To Whom It May Concern" letter
stated:

> He is currently on chronic methadone maintenance to
> control his pain to some degree. He can stand no longer
> than 15 minutes, can walk 100 ft or less, sit for very
> limited periods, lift/carry 10# or less.  He uses a
> walking stick, cannot climb, crawl, kneel, stoop,
> squat.

Tr. 620.  Dr. Campbell's May 4, 2006 note, in addition to

---

[7]This disability form was the same form completed by Drs.
Campbell and Boespflug.  The form defined "total" disability as a
disability rendering claimant "incapable of continuing employment
in any gainful occupation for which substantial retraining would
not be required."  Tr. 617.

describing the same impairments listed by Dr. Schwab, states:

> Can stand 15', walk 100 ft, sit for limited periods,
> lift/carry 10#; uses walking stick; cannot climb,
> crawl, kneel, stoop, squat... Methadone gives him some
> control.

Tr. 541. As noted above, Dr. Campbell's limitations were based
on claimant's subjective reporting of symptoms. Because Dr.
Schwab's limitations are nearly a verbatim recitation of Dr.
Campbell's note, and because Dr. Campbell's limitations were
based on claimant's subjective reporting, the ALJ gave the
limitations little weight.

Similarly, the ALJ gave little weight to Dr. Schwab's
September 18, 2007 "To Whom It May Concern" letter. Tr. 467,
621. Like the previous letter, this letter contains Dr. Schwab's
opinion that claimant's pain is exacerbated by any level of
activity and that claimant is disabled. Tr. 621. However, this
letter was not based on any new clinical findings, as Dr. Schwab
only examined claimant once, on April 2, 2007. Id. In addition,
the letter also states that claimant has had all the tests
necessary to investigate his condition, including an MRI of his
spine, nerve conduction study, and plain x-rays. Id. However,
the ALJ noted that the listed tests have "been either within
normal limits or merely disclosed minimal to mild abnormalities."
Tr. 467. The results of claimant's tests were discussed above.
The ALJ provided specific and legitimate reasons, supported by
substantial evidence in the record, for giving little weight to

Dr. Schwab's opinion that claimant is totally disabled.

Dr. Rullman

Dr. Rullman is the medical expert who testified at the December 21, 2007 hearing. Claimant argues the ALJ improperly rejected Dr. Rullman's opinion that claimant's knee impairment medically equaled the criteria for major dysfunction of a joint found in 20 C.F.R. 404, Subpart P, App. 1, § 1.02 ("1.02"). However, a review of the record reveals Dr. Rullman was not of the opinion that claimant met the definition of major joint dysfunction found in 1.02. The ALJ asked Dr. Rullman "[w]hat listing would [claimant] meet on the knee problem?" Tr. 637. Dr. Rullman responded that claimant would meet 1.02, major dysfunction of a joint. However, Dr. Rullman stated that to meet 1.02, there would have to be physical findings or very significant X-ray findings. Id. Dr. Rullman first stated there were no significant X-ray findings, and then considered whether the fluid in claimant's knees would constitute "physical findings." Dr. Rullman testified that based on the records he had, claimant did not have physical findings relating to his knee. Id. However, Dr. Rullman stated, "[b]ut [1.02] would be the - - his one opportunity, I think, to meet the listings." Id.

Later in the hearing, Dr. Rullman did state, "I think it's reasonabl[e] to conclude that he equals 1.02 because of his knees." Tr. 639. The context reveals Dr. Rullman was of the

opinion that claimant might medically equal 1.02.  This
interpretation is strengthened due to an exchange between the ALJ
and claimant's attorney later in the hearing:

Attorney: So you [speaking to Dr. Rullman] talked about
[claimant's] knees equaling the listing of 1.02 but --

ALJ:  Did you say "equaling?"  [Dr. Rullman] didn't say
"meeting."  [Dr. Rullman] said it "might equal."

Attorney:  [Dr. Rullman] said "might equal," yeah.

ALJ:  Yeah

Attorney:  I was using "equaling"...

Tr. 641.

In addition, later in the hearing, the ALJ stated, "Dr.
Rullman thinks [claimant] may equal 1.02..."  Tr. 644.  Towards
the end of the hearing, the ALJ referenced Dr. Rullman's
testimony that claimant's knees "maybe" equal 1.02.  Tr. 650.

The AlJ properly evaluated Dr. Rullman's opinion that
claimant might equal 1.02.  Of course, the ALJ also had a duty to
evaluate the alternative view necessarily contained in Dr.
Rullman's testimony: that claimant's knee *might not* medically
equal 1.02.  The ALJ pointed noted that claimant has not seen a
doctor regarding his knee condition since May 4, 2006.  Tr. 456.
The ALJ also noted the opinion that claimant medically equals
1.02 is not consistent with the objective results showing minimal
degenerative changes in claimant's knees.  Id.  The ALJ gave

specific and legitimate reasons, supported by substantial evidence in the record, for determining claimant's knee did not medically equal 1.02.  Thus, the ALJ's finding will not be disturbed.

3.  Claimant's VA Disability Rating

In the Ninth Circuit, an ALJ must consider, and ordinarily give "great weight" to, a VA disability determination.  McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002).  However, a VA determination that a claimant is disabled does not compel an ALJ to find the claimant is disabled.  Id.  For example, an "ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record."  Id.

On July 10, 2002, the VA determined claimant's service-connected disabilities prevented claimant from working.  Tr. 304. The VA found claimant entitled to 100% disability due to his 70% disability rating.  Claimant's impairments consisted of a major depressive disorder and myofascial pain syndrome secondary to snapping scapula syndrome.  Id.  The VA did not include fibromyalgia or the osteoarthritis in claimant's knee in the disability rating.  Id.  On October 23, 2003, the VA found claimant's disability was permanent and total.  Tr. 171.

The ALJ found the VA's disability determination was not entitled to great weight because the ALJ "examined a wider range

35 - OPINION AND ORDER

of medical evidence than was relied upon by the board - including the well-founded opinions of Drs. Wyles, Hook, Stolzfus and Sacks..." Tr. 466. In addition, the ALJ noted that the VA determination relied heavily on the opinions of Drs. Campbell and Boespflug. Id. As discussed above, the ALJ properly accorded little weight to the opinions of Drs. Campbell and Boespflug.

Claimant's reliance on the decision in McCartey is misplaced. In McCartey, the ALJ erred by completely disregarding the claimant's VA disability rating. Unlike the ALJ in McCartey, the ALJ here considered the VA rating but then provided specific reasons for giving the VA rating less weight. Tr. 466.

Additionally, the Ninth Circuit recently held that an ALJ "was justified in rejecting the VA's disability rating on the basis that [the ALJ] had evidence the VA did not, which undermined the evidence the VA did have." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 695 (9th Cir. 2009). Here, the ALJ had substantial evidence suggesting claimant was not totally disabled. Most notably, the ALJ relied on Dr. Hook's examination of claimant, during which claimant *demonstrated the ability to work*. The ALJ also relied on the opinion of Dr. Wyles that claimant was employable in an alternative occupation. The ALJ also relied on the opinions of the NEP. None of these opinions were available to the VA. Tr. 101-02, 374. In short, the additional medical opinions relied on by the ALJ, which were

36 - OPINION AND ORDER

unavailable to the VA, constitute persuasive, specific, and valid
reasons, supported by substantial evidence in the record, for
giving the VA disability rating little weight.  <u>See</u> <u>Valentine</u>,
574 F.3d 695.

4.  <u>Claimant's Need to Lie Down</u>

     Claimant argues the ALJ failed to consider claimant's
testimony that he needs to lie down periodically.  However, the
ALJ considered claimant's testimony regarding his need to lie
down, but rejected it because he found claimant was not credible.
The ALJ noted that the claimant was bedridden for three
consecutive days in the week prior to the December 21, 2007
hearing.  Tr. 459.  The ALJ noted claimant's testimony regarding
his ability to stand for 30 minutes, then having to lie down for
30 minutes or so to rest.  Tr. 461.  The ALJ noted claimant
testified that he has to lie down up to four times per day, from
15 minutes to the entire day.  <u>Id.</u>

     Although the ALJ was required to consider claimant's
testimony regarding measures taken to relieve pain, the ALJ need
not believe everything the claimant testifies to.  As discussed
above, the ALJ provided clear and convincing reasons for
rejecting claimant's testimony as to the severity and limiting
aspects of his impairments.  This determination will not be
disturbed on review.

     In addition, the only medical opinion concerning claimant's

need to lie down is Dr. Boespflug's May 29, 2003 letter stating *claimant's subjective assertion* that he needs to lie down two hours per working day (to relax his upper back muscles) "may well be both reasonable and minimal." Tr. 326, 464. However, the ALJ found this opinion was not unequivocal, and was unhelpful in formulating claimant's RFC. Tr. 464. In addition, as discussed above, the ALJ gave little weight to Dr. Boespflug's specific limitations. The ALJ also found claimant's subjective reporting was not credible. The ALJ's interpretation of the letter was rational, and will not be disturbed.

5. <u>Claimant's Psychologically-Based Pain</u>

Claimant argues that none of the evidence relied on by the ALJ in determining claimant's RFC took plaintiff's psychological factors into consideration. Claimant argues these psychological factors may magnify claimant's pain. Therefore, claimant argues the ALJ did not fully consider the combined effects of claimant's impairments.

On January 8, 2001, Dr. Campbell stated "there is certainly a psychological component to [claimant's] pain, consisting of severe anxiety and depression." Tr. 190. On October 29, 2001, Dr. Stoltzfus, a licensed clinical psychologist examined claimant. Tr. 207-11. Dr. Stoltzfus diagnosed claimant with chronic adjustment disorder with depression and anxiety, secondary to physical pain. Tr. 210-11. On May 16, 2002, Dr.

38 - OPINION AND ORDER

Sacks, Ph.D., examined claimant.  Tr. 299-302.  Dr. Sacks
diagnosed claimant with a pain disorder due to medical and
psychological factors.  Tr. 301.  Dr. Sacks also stated claimant
had a "[m]ajor depressive disorder, chronic, mild to moderate,
associated with medical condition."  <u>Id.</u>

    The ALJ considered these diagnoses when he determined
claimant's RFC.  The ALJ found that claimant had: an adjustment
disorder with mixed depression and anxiety; and a pain disorder.
Tr. 455.  Both of these impairments are "severe."  Claimant cited
no evidence in the record in support of his argument that the ALJ
had a duty to further develop the record regarding any
psychological component to claimant's pain.  The ALJ incorporated
the opinions from the psychologists into claimant's RFC and no
further limitations were warranted.

**CONCLUSION**

    The Commissioner's decision is based on substantial evidence
and free of legal error, and is therefore, affirmed.  This case
is dismissed.

    IT IS SO ORDERED.

        Dated this  8   day of October, 2009.




                          /s/ Ann Aiken
                          Ann Aiken
                  United States District Judge


39 - OPINION AND ORDER